# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **ATLANTA HARDY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00662** |
| | ) | **Judge Aleta A. Trauger** |
| **GLORIA FISHER et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM</u>

Before the court is the Motion for Summary Judgment filed by defendants Gloria Fisher, Roger Tidwell, Terry Barlow, and David Law. (Doc. No. 53.) For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.     FACTS[1]

Plaintiff Atlanta Hardy is an inmate at the Debra K. Johnson Rehabilitation Center in Nashville, Tennessee, a facility known until recently as the Tennessee Prison for Women ("TPW"). She brings suit under 42 U.S.C. § 1983, alleging violations of her constitutional rights by the defendants. As discussed in more detail below, Hardy alleges that her rights to procedural and substantive due process were violated (1) when she was found guilty in August 2019 of a disciplinary charge based on the defendants' knowing presentation of, or reliance on, false

---

[1] The facts set forth herein are from the defendants' Statement of Undisputed Facts (Doc. No. 55), the plaintiff's Response to the defendants' Statement of Undisputed Facts (Doc. No. 60), the plaintiff's Statement of Additional Facts (Doc. No. 59), the defendants' Response to the plaintiff's Statement of Additional Facts (Doc. No. 65), and the evidentiary materials cited and relied upon by the parties. If no citation is supplied for a statement of fact set forth herein, it is undisputed, at least for purposes of summary judgment.

evidence, (2) despite multiple violations of prison policy by the prison officials in the course of the disciplinary proceedings, and (3) when the plaintiff was punished by being placed indefinitely in administrative segregation. The plaintiff, who is Black, also asserts that she was punished more severely than similarly situated White inmates, in violation of her right to equal protection. (Complaint, Doc. No. 1.)

In August 2019, defendant Gloria Fisher was the Warden of TPW; defendant Roger Tidwell was an institutional investigator for the Tennessee Department of Correction ("TDOC") and an acting special agent; defendant Terry Barlow was the Associate Warden of Security at TPW; and defendant David Law was an Administrative Lieutenant and the acting chairperson of the Disciplinary Board at TPW.

The defendants assert that, on August 29, 2019, Hardy was involved in a physical altercation at TPW (the "incident" or "altercation"), during which she assaulted and severely injured her cellmate, Faith Kelso, with whom the plaintiff was also in a romantic relationship. (Doc. No. 55 ¶¶ 1–2 (citing, among other documents, Doc. No. 55-6, Fisher Decl. ¶¶ 3–4).) The defendants claim that Kelso's injuries were so severe that she could not be treated at the facility and required transportation to an outside hospital. (Doc. No. 55 ¶ 13 (citing, among other documents, Doc. No. 55-6, Fisher Decl. ¶ 5; Doc. No. 55-1, Tidwell Decl. ¶ 5).) Kelso was taken to Vanderbilt Medical Center for assessment and treatment.

Defendant Tidwell "happened" to be at TPW the evening of the altercation, investigating another matter. (Tidwell Dep. 13.[2]) He testified that, shortly after the altercation, he observed

---

[2] The plaintiff filed complete copies of the condensed transcripts of the depositions of David Law (Doc. No. 61-1), Gloria Fisher (Doc. No. 61-2), Roger Tidwell (Doc. No. 61-3), and Atlanta Hardy (Doc. No. 61-4). The court refers herein to these depositions by the original transcript pagination only.

Kelso, who was "frantic, kind of screaming and hollering and crying." (*Id.*) He did not see the incident itself. (*Id.* at 14.) Tidwell testified that he asked Kelso what happened, and she told him that Hardy had "strangled" her and knocked a tooth out. (Tidwell Dep. 15.) She appeared distraught and was talking so fast that she was almost incoherent. (*Id.*)

Tidwell took numerous photographs of Kelso's condition immediately after the altercation. Tidwell saw (and the photographs reflect) redness on Kelso's neck and scratches on her chest. By the next day, bruises had appeared on her left wrist and right forearm, of which Tidwell also took photographs. (*See* Doc. Nos. 55-13 through 55-22, 55-25 through 55-37.[3]) During his investigation into the incident, Tidwell found a damaged television and damaged computer tablet inside the cell to which Kelso and Hardy were assigned. (Doc. Nos. 55-23, 55-24.) Hardy does not dispute that she caused the damage to these items, but she denies that the damage was intentional. (*See* Hardy Dep. 43, 52.)

Almost immediately after the altercation, Hardy was escorted to the segregation unit by the unit sergeant, and she remained in administrative segregation pending a disciplinary hearing. The next day, Tidwell and defendant Barlow met with Hardy to question her about the incident. According to Tidwell, Hardy told them that she and Kelso had gotten into a "fight," started by Kelso when Kelso punched Hardy in the nose. (Tidwell Dep. 29.)

Tidwell also interviewed two other inmates, Latoria Hill and Tabatha White, who witnessed the incident and who allegedly told him that they had intervened to try to stop the physical altercation between Hardy and Kelso. (Tidwell Decl. ¶¶ 6–8; Tidwell Dep. 52–53, 61–62.) Tidwell avers that he concluded, based on his investigation, that Hardy assaulted Kelso and that Hardy was the "sole aggressor." (Tidwell Decl. ¶ 6; *see also* Tidwell Dep. 29–30, 54–55.)

---

[3] The photographs of Kelso show that she is White.

Hardy disputes the defendants' version of events. According to Hardy, when she was interviewed by Tidwell and Barlow shortly after the incident occurred, she first asked them why she was in administrative segregation "pending investigation" and told them that she had never been served an infraction form in connection with the assault charge (as required by TDOC policy). (Hardy Dep. 20–21.) When they asked about what had happened between her and Kelso, she explained that, at the time of the incident, Kelso was "irate," "on drugs," and "into it" with not just Hardy but several other people. (Hardy Dep. 20.) Hardy denied assaulting Kelso and described her role in the incident as entirely defensive:

> I was pushing her back, trying to keep her off of me. Blood was running out my nose. So then her TV had fell off the thing. I stepped on the TV, trying to get out of the room and she just kept on. And finally I just grabbed her by the arms and tried to push her back. When I did, that's when she ran out of the room.

(Hardy Dep. 43.) There is no dispute that Hardy is a large woman, much larger than Kelso. (Hardy Dep. 43.) She stated during her deposition: "I didn't want to fight her. . . . If I had fought her, you're looking at me now, seeing me, look at my hands. If I had fought her, I would have hurt her. You know it and I know it." (Hardy Dep. 44.)

In support of her version of events, Hardy also points to Kelso's Affidavit, in which Kelso claims that, on August 29, 2019, she got into an altercation with another inmate, Tabatha White, that Hardy intervened to attempt to prevent the argument from escalating, and that, while Hardy attempted to restrain Kelso, she never hit her, though Kelso punched Hardy in the nose, likely breaking it. (*See* Doc. No. 58-1, Kelso Aff. ¶¶ 4–15; *see also* Hardy Dep. 42–44.) However, shortly after the incident, Kelso was "taken to the shift commander's office for questioning" by Tidwell, while Hardy, White, and Hill were charged with assault. (Kelso Aff. ¶ 7.) Kelso further attests that, when he interviewed her, Tidwell "did not appear to be interested in what happened." (Kelso Aff. ¶ 8.) Instead, he appeared to be focused on an investigation into Hardy for allegedly running a drug

operation inside the prison. (*Id.*) Kelso claims that she "tried to explain to Mr. Tidwell that [she] had hit Ms. Hardy and that Ms. Hardy was innocent of the assault she was being charged with," but Tidwell did not listen to her, told her to shut up, and "eerily kept reminding [her] of her current out-date," emphasizing how soon she was scheduled to leave incarceration. (Kelso Aff. ¶ 9.) Kelso claims that Tidwell "made it clear" that her "out-date" could be pushed back if she did not "keep quiet about what really happened." (*Id.*)

The plaintiff also denies that Kelso was "seriously injured," as the defendants claim. While there is no dispute that Kelso was taken to Vanderbilt Medical Center, Kelso states in her Affidavit that she was not seriously injured and that Vanderbilt made it clear that she had not suffered any serious injuries. (Kelso Aff. ¶ 10.) The plaintiff also points out that Tidwell's photographs of Kelso show a few scratches and bruises and a broken tooth but do not reflect serious injuries.[4] The plaintiff does not deny that White and Hill made statements to Tidwell implicating Hardy as the aggressor in the incident, but she denies the accuracy of their alleged statements, citing her own and Kelso's descriptions of the incident. The plaintiff insists that Tidwell knew that Hardy did not assault Kelso. (*See* Kelso Aff. ¶ 9; Hardy Dep. 19–20; *see also* Tidwell Dep. 28–29 (explaining what Hardy had told him).)

In addition, Hardy is in possession of a letter from Kelso, in which Kelso apologizes for lying about the incident and acknowledges that she punched Hardy in the nose. (Doc. No. 1-3, at 2–3.) The letter states in relevant part:

> I was just so mad @ you about the whole situation & by the time I snapped back to reality and realized that they was going to "HS" you it was to late. Nobody was trying to hear me and they wasn't trying to take me serious. When I was still in Unit 3 in D-pod I told Tidwell that I would have been better off if I had told the truth

---

[4] While it is conceivable that Kelso's actual medical records from Vanderbilt are buried somewhere in the almost 800 pages of documents filed by the plaintiff, neither party has brought them to the court's attention.

and took my seg days & he told me to shhh & not tell anyone else that. Then I got moved to the Annex the next day or maybe even that day. After that I was scared to push the issue b/c of what thier doing to you. I was scared they would take all my good days and I would loose my kids . . . . So I just stopped trying. They knew that I hit you b/c you had blood all over your shirt & Tidwell saw the bloody rag in the cell where I was picking up my stuff and I told him it was your blood from your nose. . . . I wasn't bleeding. Well my chest was scratched but not enough to produce the ammount of blood on that rag & your shirt and I feel like that's why he didn't take that into evidence. Bae I'm so sorry will you please forgive me!

(*Id.* at 3–4.)

The defendants state that, prior to this lawsuit, Tidwell was not aware of the existence of this letter. (Tidwell Dep. 57–58.) The plaintiff purports to dispute that statement, but the evidence to which she cites—Kelso's Affidavit—indicates only that Kelso attempted to convey the same information to Tidwell and that she wrote other letters to Tidwell and Fisher. (Kelso Aff. ¶ 13.)

Tidwell states that Kelso never told him she had been dishonest in her initial report to him about what happened during the altercation with Hardy and denies ever threatening her or telling her to stay silent regarding what really happened. (Tidwell Dep. 47, 48.) His statement is clearly contested by Kelso's Affidavit. (Kelso Aff. ¶¶ 9, 11, 13.)

In response to the plaintiff's reliance on Kelso's Affidavit in support of her version of events, the defendants point out that Kelso's current account of the incident is at odds with her statements to Tidwell shortly after the incident occurred and when she was still in an emotionally excited state. (Doc. No. 65, Defs.' Resp. to ¶ 1 (citing Tidwell Dep. 15 ("[S]he could barely talk. She, I mean Faith Kelso. She was like, wheezing . . . . And she – she's going a thousand miles per hour so she was almost borderline incoherent. She kept, you know – she was very emotionally distraught."); *id.* at 18, 68).)

The defendants also point to a letter Hardy wrote to Kelso shortly after the incident, in which Hardy apologized for smashing Kelso's television and tablet and for "louseing it like I did." (Doc. No. 55-2, at 22.) In the letter, she also acknowledged that she was "wrong" and had "hurt

the one person [who had ever] come into [her] life and show[n her] great love and loyalty for so long." (*Id.*)

There is no dispute that Hardy was charged with assault based on the outcome of Tidwell's investigation. (*See* Disciplinary Report, Doc. No. 58-5, at 3.)[5] Although the first page of the Disciplinary Report indicates that none of the persons involved (specifically including Kelso) was injured, the second page of the same document provides additional detail and states that "Inmate Kelso had to be sent to the outside hospital due to her injuries." (Doc. No. 58-5, at 3–4.) Tidwell explained that the notation on the first page that there were no injuries was a data-entry error. (Tidwell Dep. 44–46.) Tidwell testified that his shift commander, Captain Hornsby, prepared the Disciplinary Report with Tidwell's input. (Tidwell Dep. 33–37.) The Report itself states that it was prepared by Markus Hornsby and "reported by" Tidwell. (Doc. No. 58-5, at 3.)

Following the incident, Hardy was placed in administrative segregation pending further investigation and a disciplinary hearing. (Doc. No. 55-6, Fisher Decl. ¶ 8.) Warden Fisher testified that she alone possesses the decision-making authority to place an inmate in administrative segregation (and to remove an inmate from administrative segregation), and she alone made the decision to place Hardy in segregation. (Fisher Decl. ¶¶ 13–14; Fisher Dep. 83.) Fisher also testified, however, that she heavily relied on the Disciplinary Report to make that decision. (Fisher Dep. 20, 22.) She states in her Declaration that she placed Hardy in administrative segregation due to the "severity of the harm she inflicted on inmate Kelso and out of concern for the safety of other inmates thereafter, believing that Hardy posed a danger to them." (Fisher Decl. ¶ 14.) As set forth

---

[5] The Disciplinary Report is brief and clearly preliminary, as it also states that two other inmates in addition to Hardy were charged with assaulting Kelso, but those charges were eventually dropped. The Disciplinary Report does not identify the injuries allegedly suffered by Kelso but simply states that she was "sent to the outside hospital due to her injuries." (Doc. No. 58-5, at 3.)

above, the plaintiff denies that she posed a danger to others and denies that Kelso was seriously injured.

Fisher is responsible for appointing the members of the Disciplinary Board, and she appointed those serving in 2019. Defendant David Law presided over Hardy's disciplinary hearing on September 6, 2019. (Doc. No. 55-3, Law Decl. ¶ 7.) Law would have been the person who completed the Disciplinary Report Hearing Summary following the plaintiff's hearing, except for the signatures of the other members of the Disciplinary Board and the "Y" denoting that the decision was appealed. (Law Dep. 17–18.) The defendants assert that, following the hearing, the Disciplinary Board found Hardy guilty of assaulting Kelso. (Fisher Decl. ¶ 9; Law Decl. ¶ 7.) The plaintiff disputes that statement, pointing out that the Disciplinary Report Hearing Summary is somewhat ambiguous, insofar as it is marked "N," for "Not Guilty," in the space allotted for denotation of the Committee Decision on the first page of the two-page Summary. (Doc. No. 55-10, at 4.)[6] At the same time, however, the remainder of the Summary dispels any possible ambiguity. First, the same block of the Disciplinary Report Hearing Summary contains a "Y" (for "Yes") in the space allotted for indicating whether the decision was or was not appealed, and, under "Class of Infraction," an "A" is circled. (*Id.*) If, indeed, the Committee had found the plaintiff to be not guilty of the charged infraction, there would have been no decision for Hardy to appeal, and the type of infraction would have been moot. In addition, on page 2 of the same Summary, the handwritten notations under "Findings of Fact and Specific Evidence Relied Upon to Support Those Findings" and "Disposition and a Statement of Reasons Which Supports That Decision" unambiguously state that Hardy was found guilty of assault and recommend punishment in the form of five days of administrative segregation, or time served, a twelve-month package

---

[6] Law was unable to explain why the first page was marked "N." (Law Dep. 17.)

restriction, and $5 fine. (*Id.* at 5.)[7]

According to the Disciplinary Report Hearing Summary, the evidence considered by the Disciplinary Board included Hardy's testimony, Tidwell's testimony, and the Disciplinary Report. (*Id.*) According to an attachment to the Summary summarizing Hardy's statement, Hardy testified that inmates Hill and White were trying to stop Kelso and Hardy from fighting, that "Ms. Kelso swung first and started the fight," and that Hardy "had to defend herself." (*Id.* at 6.) She also protested that she was being framed and discriminated against. (*Id.* at 5–6.) The attachment also summarizes Tidwell's testimony as stating that the two other inmates had reported to him and another agent, within minutes of the incident, that Kelso had been assaulted by Hardy. (*Id.* at 7.) He stated that he assessed Kelso's injuries before sending her to medical and that Hardy's injuries were "minor" while Kelso's were "concerning." (*Id.*) He reported that Kelso was sent out for a CAT Scan and an MRI, that she had a "severely bruised" wrist, scratches, and a broken tooth, and that her injuries were "consistent with being choked." (*Id.*)

It is undisputed that administrative segregation was a typical punishment at TPW for an assault by an inmate resulting in serious injuries. David Law testified that the Board recommended disciplinary segregation for Hardy due to the "seriousness of the offense." (Law Dep. 28.) Fisher testified that administrative segregation is normally recommended for "serious incidents," such as

---

[7] The plaintiff purports to dispute the defendants' statement of fact as to the Disciplinary Board's recommendation, stating: "We have no idea what the TPW Disciplinary Board truly recommended given the not guilty finding and Defendant Fisher's admission that the Disciplinary Hearing Summary Report appears to have multiple ink fonts for some unknown reason." (Doc. No. 60, Pl.'s Resp. to ¶ 34.) Neither of the two copies of the Disciplinary Report Hearing Summary filed by the parties is in color, so the purported use of two fonts is not evident to the court. Moreover, even if the court accepts as true the plaintiff's suggestion that two different pens were used to complete the Summary, and even that two different people completed the Summary, these facts would not prove or even give rise to an inference that the Summary was somehow falsified or is otherwise not what it purports to be.

those giving rise to a "risk to the safety and security of the compound." (Fisher Dep. 39–40.) She testified that Kelso's injuries were considered "serious" enough to warrant administrative segregation for the plaintiff. (Fisher Dep. 80.) Following the disciplinary hearing on September 6, 2019, Fisher approved the Disciplinary Committee's recommendation that Hardy be placed in administrative segregation but extended it through September 17, 2019 (rather than the five-day time-served sentence recommended by the Disciplinary Board). (Fisher Dep. 81; *see also* Fisher Decl. ¶ 10.) In addition, Fisher reclassified the plaintiff as maximum custody, effective September 6, 2019. (Fisher Decl. ¶ 10.)

The plaintiff asserts that Fisher was "aware that the Plaintiff's assault charge was premised on the words of an inmate [who] admitted she lied" and who had sent a letter to Fisher recanting her initial statements, but Fisher kept Hardy in administrative segregation anyway. (Doc. No. 60, Pl.'s Resp. to ¶ 36 (citing Doc. No. 58-8, at 3–5; Kelso Aff. ¶ 13).) These documents do not support the plaintiff's assertions. In her Affidavit, Kelso states that she sent a handwritten letter to Fisher, but she does not purport to have a copy of it and does not state when she mailed the letter, so there is no evidence of whether or when Fisher received it.[8] The plaintiff's other citation is to Inmate Grievance Meeting Minutes dated December 20, 2019, which note that the plaintiff stated that she had "received a letter from the victim, who admitted to fighting and lying about the events that led to [administrative segregation] placement" and claimed that she had been "advised . . . not to be truthful." (Doc. No. 58-8, at 3.) There is no indication, however, that the Warden was aware of that letter—in particular, there is no evidence that the Warden was aware of Kelso's letter at any

_____

[8] In her Complaint, the plaintiff alleges only that, "[l]ater, upon being released from [TPW] custody, Ms. Kelso sent a handwritten letter to the Plaintiff where she provided details about the incident that had not previously been brought to the Plaintiff's attention" (Doc. No. 1 ¶ 29), but she does not indicate when Kelso was released from custody.

time prior to Grievance Meeting on December 20, 2019.

On September 23, 2019, well before that meeting, Hardy appealed her disciplinary conviction to Fisher, who denied it. On October 28, 2019, Hardy appealed to TDOC Commissioner Tony Parker. The Commissioner affirmed the original disciplinary decision.

Fisher testified that she alone has the decision-making authority to change an inmate's security classification to "maximum custody." (Fisher Decl. ¶ 13.) She also opined that the "conditions of confinement in segregation and in maximum custody are substantially the same." (Fisher Decl. ¶ 10.) The plaintiff purports to deny the truth of that statement on the basis that it is "speculative, self-serving" and "made without personal knowledge of living inside the conditions of confinement in administrative segregation" (Doc. No. 60, Pl.'s Resp. to ¶ 39), but she does not offer any countervailing evidence of actual differences between maximum custody and administrative segregation.

At least for purposes of summary judgment, the plaintiff does not dispute that, while she was in administrative segregation, she initially began the "step-down program," completion of which would have allowed her to end her segregation, but she was removed from the step-down program because of a pending investigation in a matter unrelated to the incident involving Kelso.[9] (Doc. No. 60, Pl.'s Resp. to ¶ 40.) She eventually resumed the step-down process in February 2020 and completed all three required phases of the program by August 14, 2020. (*Id.*, Pl.'s Resp. to ¶ 41.) It typically takes six to nine months for an inmate to complete the step-down program, and it is not uncommon for an inmate to take a year to complete it. (*Id.*, Pl.'s Resp. to ¶ 42.) The plaintiff remained in maximum custody until August 6, 2020. (Fisher Decl. ¶ 10.)

---

[9] There is no evidence in the record regarding the subject or outcome of this unrelated investigation, but there is also no evidence that the plaintiff was ever charged with any additional infraction of any kind. (*See* Doc. No. 65-1, at 6 (plaintiff's disciplinary history).)

Defendants Tidwell, Barlow, and Law all testified that they did not possess any authority to place the plaintiff in administrative segregation or to reclassify her as maximum custody and that such authority rests solely with Warden Fisher. (Tidwell Decl. ¶¶ 10–11; Doc. No. 55-5, Barlow Decl. ¶¶ 2, 8, 9; Law Decl. ¶¶ 10, 11.) Tidwell, Barlow, and Law also attest that they were not involved in the decision to place the plaintiff in administrative segregation or to reclassify her as maximum security and that they were not involved in a conspiracy to do so. (Tidwell Decl. ¶ 11; Barlow Decl. ¶ 9; Law Decl. ¶ 11.) The plaintiff does not dispute these statements except by pointing out that Fisher did not make her disciplinary decisions in a vacuum. Fisher testified that Barlow, as associate warden, oversees security at the facility and that inmate discipline falls within his purview. (Fisher Dep. 13–15.) In that role, he has the capacity to "guide" the chairperson of the Disciplinary Board "about policy and procedure" and to provide advice in response to any problems or questions that might arise. (*Id.* at 15.) Fisher also testified that, in issuing discipline following the investigative hearing, she relied on the Disciplinary Board's recommendations and on the Investigative Report. (*Id.* at 20, 27, 81.)

Fisher, Tidwell, Barlow, and Law all state that none of their actions in connection with the investigation of the incident, the hearing, the appeals, and the plaintiff's punishment was based on race. (Fisher Decl. ¶ 15; Tidwell Decl. ¶ 12; Barlow Decl. ¶ 10; Law Decl. ¶ 12.)[10] Hardy disputes these assertions, pointing to her own deposition testimony, averring that David Law had referred to her by a racial epithet at some point between 2018 and 2019 (Hardy Dep. 37)[11] and that, while

---

[10] Fisher also testified that she is African American. (Fisher Dep. 84.) The race of the other defendants is not readily apparent from the record.

[11] The defendants dispute this assertion. Law, however, was not asked during his deposition whether it occurred. Instead, he was asked whether he "recalled" this incident or being reprimanded in connection with it; he did not. (Law Dep. 37.)

she was in segregation, every other inmate in segregation except for one was, like her, Black (Hardy Dep. 61–63).

The defendants purport to dispute the plaintiff's suggestion that only Black inmates were in administrative segregation at the time, on the basis that the plaintiff did not have personal knowledge of the race of all inmates in administrative segregation at the same time as she was. In addition, they also cite to a 2019 Administrative Segregation summary, submitted with their Reply, which is a spreadsheet purportedly listing all TPW inmates in segregation in 2019 by race. This document shows that, of thirteen inmates serving in segregation, one was Hispanic, two were White, and ten were Black. (Doc. No. 65-2, at 1.) Fisher testified that she did not know, at the time of her deposition, the racial composition of the inmates in administrative segregation but that it would not surprise her if more were Black than White, given the "entire population as far as race on a percentage base." (Fisher Dep. 87.) There is no evidence in the record regarding the racial composition of the inmate population at TPW during the relevant timeframe (or at any time).

In addition, however, the plaintiff points to five White inmates at TPW who were found guilty of assault against other inmates around the same time as she was but allegedly "did not receive administrative segregation as a result of their conduct." (Doc. No. 59 ¶ 68 (citing Hardy Dep. 25–26; Doc. Nos. 58-53 and 58-54.) The defendant asserts that the records to which the plaintiff cites actually show that one of the five inmates was never found guilty of Class A assault and that the other four inmates pleaded guilty to Class A assault (*i.e.*, did not go through a disciplinary hearing) and received punishments commensurate with the plaintiff's.

The records to which the parties cite, indeed, reflect that one of the plaintiff's proposed comparators, Samantha Daniel, was never charged with assault or any other Class A offense, though she was charged with "fighting." (Doc. No. 58-53, at 43–48.) The records of the other four

inmates on which the plaintiff relies show that they were all charged with, and found guilty of, assault, a Class A offense, and that they supposedly received administrative segregation as part of their punishment:

- Inmate Elizabeth Graves was charged with "assault on ofn without we," presumably assault on another inmate ("offender") without a weapon, on September 30, 2019. (Doc. No. 58-53, at 49.) Her disciplinary history reflects numerous other recent infractions: seven B and C infractions in August and September 2019 alone for defiance, possession of contraband, selling/possession of drugs, and sexual misconduct. (*Id.*) She pleaded guilty to the assault charge and received a "sentence" that included a $5.00 fine, a 12-month package restriction, and 10 days in segregation, effective October 2, 2019. (Doc. No. 58-54, at 34–37.) A separate entry suggests that the ten days was reduced to three days, or time served. (*Id.* at 38.)

- Inmate Christy Campbell was charged with "assault on ofn without we" on September 27, 2019. (Doc. No. 58-53, at 52.) Her disciplinary history also reflects numerous other prior disciplinaries for 2018–2019, both A and B level, including for possession/selling of drugs, defiance, and fighting, as well as another assault charge for "assault on stff without w" on February 9, 2019. (*Id.* at 52–53.) Regarding the September 2019 assault, the records reflect that she pleaded guilty and received a sentence of a $5.00 fine, a 12-month package restriction, and 30 days of punitive segregation. Doc. No. 58-54, at 29–32.) There is no additional information in the record regarding the February 2019 assault on a staff member.

- Inmate Baby Nix was charged with "assault on ofn without we" on November 22, 2019 (and defiance, a Class B infraction, just a few days later). (Doc. No. 58-53, at 56.) She had also been charged with a similar A-level assault on April 17, 2019. (*Id.* at 57.) In addition, her disciplinary record reflects numerous prior B and C level infractions in 2018 and 2019, for defiance, positive drug screen, and selling/possession of drugs, among others. (*Id.* at 56–59.)

  Regarding the April 2019 assault, Nix pleaded not guilty, was supposedly held in segregation pending investigation, was found guilty of a Class A offense following a disciplinary hearing, and received a $5.00 fine, 12-month package restriction, and 20 days of segregation (including 10 days time served). (Doc. No. 58-54, at 20–21.) The disciplinary report indicates the victim was injured (*id.* at 22), and the narrative report of the investigation indicates that much of the incident was captured on video, which showed that Nix "r[a]n towards and beg[a]n punching" the other inmate multiple times in the head and face (*id.* at 23). The Disciplinary Report was prepared by Tidwell. (*Id.*) In November 2019, Nix pleaded guilty to assault on another inmate without a weapon and received a $5.00 fine, 12-month package restriction, and 10 days of segregation. (*Id.* at 11–14.)

- Inmate Shianne Mount also has a lengthy disciplinary record, with numerous prior B-level infractions for defiance, contraband, sexual misconduct, and fighting, among others, as well as a prior A-level assault with weapon in 2016. (Doc. No. 58-53, at 64–66.) In November 2019, she was charged with assault on another inmate with a weapon (an electric

iron "used as a weapon"). (*Id.* at 65; Doc. No. 58-54, at 6.) She pleaded guilty (Doc. No. 58-53, at 69), and, as recommended by the Disciplinary Board, received a $5.00 fine, 12-month package restriction, and 10 days in administrative segregation. (*Id.* at 70; Doc. No. 58-54, at 1, 6–9).

As set forth above, the plaintiff also received a $5.00 fine, twelve-month package restriction, and twenty-one days in administrative segregation—although the Disciplinary Board recommended only five days, all of which she had already served. Moreover, Hardy actually served much more than twenty-one days in administrative segregation, as it is undisputed that she remained in segregation until August 14, 2020. The plaintiff's electronic disciplinary record, unlike those of the comparator inmates, shows no recent disciplinary infractions prior to the September 2019 assault charge. Her most recent prior infraction was a B-level charge for fighting in May 2016. (Hardy Dep. Ex. 1, Doc. No. 65-1, at 6.)

More importantly, the evidence submitted by the *defendants* calls into question whether any of the four White inmates discussed above actually served *any* time in administrative segregation, even though they were apparently sentenced to administrative segregation. The defendants have not produced documentation showing whether the Warden actually approved the punishments recommended by the Disciplinary Board. Further, although all of the assault infractions referenced above took place in 2019, and the disciplinary sentences were handed down in 2019, the spreadsheet submitted by the defendants with their Reply shows that only two white inmates, Billie Jo Carden and Anna Marie Sutherland, spent time in administrative segregation in 2019. (Doc. No. 65-2, at 1.) This documentation, if nothing else, calls into question whether Elizabeth Graves, Christy Campbell, Baby Nix, and Shianne Mount, all White inmates charged with assault on another inmate around the same time as the plaintiff (one using a weapon and two of whom were found guilty on two assault charges each in 2019 alone), all with much more extensive prior recent disciplinary infractions than the plaintiff, actually served the administrative

segregation sentences recommended by the Disciplinary Board or whether, instead, the Warden exercised her discretion to overrule those recommendations.

In any event, the defendants all attest that, during the course of the investigation into the incident involving Kelso and Hardy, the disciplinary hearing, the plaintiff's appeals, and the plaintiff's placement in segregation, they did not create, disseminate, rely upon, or perpetuate any physical or empirical evidence that they knew to be false. (Fisher Decl. ¶ 12; Tidwell Decl. ¶ 8; Barlow Decl. ¶ 6; Law Decl. ¶ 8.) The plaintiff purports to dispute these statements, citing, again, Kelso's Affidavit as well as the documentation summarizing the plaintiff's testimony at her disciplinary hearing and grievance hearing. (Doc. No. 58-5, at 5–6; Doc. No. 58-8, at 3–4.)

In her separate Statement of Undisputed Facts,[12] the plaintiff contends that Tidwell was looking for an excuse to punish her, pointing to Kelso's statement that, during her first interview with him, "Tidwell was focused on questioning [her] about drugs he believed Ms. Hardy was having shipped into the prison" and that he even played recorded telephone calls, asking Kelso to confirm that Hardy was involved in those calls and running a drug operation inside the prison. (Hardy Aff. ¶ 8.) The defendants dispute this statement, pointing to Tidwell's testimony about his involvement in the investigation and also contesting Hardy's ability to express an opinion as to Tidwell's intention. (*See* Tidwell Dep. 29, 32–37, 53–56, 61.) The testimony to which the defendants point, however, does not actually refute Kelso's statements that Tidwell asked her about Hardy's alleged involvement in a drug operation.

---

[12] The Local Rules provide for parties opposing summary judgment to file a separate statement of facts that they believe *are disputed*. *See* L.R. 56.01(c) ("[T]he non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried."). Although the plaintiff denominates her filing as a "Statement of Undisputed Material Facts" (Doc. No. 59), her clear intention is to point to facts that she believes are disputed.

The plaintiff asserts that, prior to her disciplinary hearing, she requested that she be provided a list of staff advisors but was never provided such a list. (Hardy Dep. 37.) The defendants do not dispute this assertion, but they point out that she was given a staff advisor at the hearing. (Law Dep. 13–15; Disciplinary Report Hearing Summary, Doc. No. 58-5, at 5 (identifying "Inmate Advisor" as "K. Rhodes").) The plaintiff also objects that, despite not waiving her right to 24-hour notice of her disciplinary hearing, defendant Law acknowledged her refusal and proceeded with the hearing anyway. (Hardy Dep. 70; *see also* Doc. No. 58-5, at 5 (showing the plaintiff checked "NO" next to "I agree to waive the right to 24-hour notice.").) The defendants do not dispute that the plaintiff chose not to waive this right, but they assert that the same document also reflects that the hearing was continued from September 4 to September 6, 2019 at the "offender's" request, as a result of which Hardy received more than twenty-four hours' notice prior to the hearing. (Doc. No. 58-5, at 5.)

It is undisputed for purposes of summary judgment that, after the disciplinary hearing, the plaintiff was not immediately informed of the Disciplinary Board's decision, as required by TDOC policy. The plaintiff claims, and the defendant does not dispute, that she did not find out about the Disciplinary Board's "alleged ruling" on her charge until September 9, 2019, when she asked her unit manager. (Hardy Dep. 71.) According to Hardy, her unit manager told her that the "warden was trying to justify" an administrative segregation sentence despite the plaintiff's lack of "disciplinaries." (Hardy Dep. 71–72.) The defendants do not dispute that the plaintiff testified that this is what her unit manager told her, but they contend that this statement is inadmissible hearsay. (Doc. No. 65, Defs.' Resp. to ¶ 39.) The defendants also assert that the plaintiff, in any event, eventually received a copy of the disciplinary ruling. (*See* Law Dep. 19–20.)

The plaintiff asserts that Tidwell met with her on September 10, 2019 and told her that he

"knew that it was a fight [but] still . . . wrote it for assault." (Hardy Dep. 29; *see also id.* at 31.) She claims Tidwell told her he would ask the warden not to send her to administrative segregation. (Hardy Dep. 31.) Tidwell denies ever telling anyone he believed Hardy had not committed assault but had instead simply been involved in a fight. (Tidwell Dep. 53.) Hardy claims that Tidwell told her Barlow was the person "pushing for the assault." (Hardy Dep. 33.) Tidwell does not recall having any in-depth discussions about Hardy with Barlow. (Tidwell Dep. 59–60.) Hardy claims that Law and Tidwell both told her that Barlow told them to make sure that Hardy was found guilty of assault and sentenced to administrative segregation. (Hardy Dep. 34.) The defendants dispute this assertion as well, pointing to their testimony that they had no input in the decision whether to place Hardy in administrative segregation and were not involved in any conspiracy to place her in administrative segregation. (*See* Tidwell Decl. ¶ 11; Barlow Decl. ¶ 9; Law Decl. ¶ 11; *see also* Law Dep. at 48–49, 52 (denying having any discussions with Barlow about Hardy until after the case was decided and expressly denying telling anyone that he "had to recommend Atlanta Hardy to administrative segregation because Barlow told [him] to do it").) The plaintiff asserts that Law visited her, with her staff advisor, prior to the hearing and encouraged her to plead guilty to the assault charge. (Hardy Dep. 40.) The defendants concede that Law "may have presented a plea offer" to Hardy. (Law Dep. 21–22.)

Hardy never signed any paperwork regarding her placement in administrative segregation and did not receive any paperwork regarding such until September 14, 2019. (Hardy Dep. 72–73.) She contends that she was entitled to receive, and did not receive, a hearing prior to being placed in administrative segregation, citing TDOC Policy Rule 404.10. (Hardy Dep. 72.) The defendants dispute the plaintiff's interpretation of Rule 404.10 and assert that her hearing was conducted in accordance with Rule 404.10(VI)(B). (*See* Doc. No. 58-2, at 26; *see also* TDOC Policies and

Procedures, Administrative Segregation, Placement, Review, and Release, Index #: 404.10, Doc No. 48-3, at 2–6.)

The plaintiff's Statement of Additional Fact contains numerous statements, which the defendants do not dispute for purposes of summary judgment, summarizing TDOC policy pertaining to administrative segregation and the placement of inmates in segregation. The plaintiff claims that the defendants violated some of these policies. In particular, the plaintiff claims that she was entitled to, and was not afforded, periodic reviews by an administrative panel regarding whether she should receive early release from administrative segregation and that there is no evidence in the record that she received such reviews. The defendants, however, point to the review sheets showing that the plaintiff did receive periodic reviews of her continued administrative segregation. (*See* Doc. No. 58-54, at 52–68.)

The plaintiff states that, on September 5, 2019, she filed a grievance regarding her placement in administrative segregation and claims that she "specifically drew attention to (1) her having received a letter from Kelso admit[ing] that she lied about their altercation on August 29, 2019, (2) the Defendants have violated multiple TDOC rules." (Doc. No. 59 ¶ 80 (citing Doc. No. 58-6, at 5–10; Doc. No. 58-7, at 1–10, Doc. No. 58-8, at 1–4.) In response, the defendants point out that the records cited by the plaintiff cover several different grievances. In Grievance No. 337973 (dated September 19, 2019) (Doc. No. 58-6, at 5–6) and in Grievance No. 337792[13] (dated September 5, 2019) (Bates No. 44), the plaintiff complained about alleged violations of multiple TDOC rules, but she did not refer to a letter from Kelso. It is unclear when she received that letter. The Inmate Grievance Meeting Minutes for a meeting held on December 20, 2019 state that the

---

[13] The Grievance Numbers on the exhibits filed with the court are virtually illegible. The court accepts the defendants' representation as to the numbers on the forms.

plaintiff told the Grievance Board at that meeting that she had "received a letter from the victim, who admitted to fighting and lying about the events that led to [administrative segregation] placement" and claimed that "IA advised victim not to be truthful." (Doc. No. 58-8, at 3.)

The plaintiff claims that Fisher was aware of the allegations made in the plaintiff's September 5, 2019 grievance. (Doc. No. 59 ¶ 81 (citing 12/20/2019 Inmate Grievance Meeting Minutes, Doc. No. 58-8, at 3–5).) The defendants concede that Fisher responded to the plaintiff's grievances prior to the December 20, 2019 Grievance Board meeting, but they also assert that the plaintiff has not pointed to actual documentary evidence establishing that Fisher was aware of Kelso's letter.

## II.    PROCEDURAL HISTORY

Hardy filed a *pro se* Complaint in this court on July 31, 2020, asserting claims under 42 U.S.C. § 1983 against Warden Fisher, Associate Warden Barlow, Staff Investigator Tidwell, Disciplinary Hearing Officer Law, and TDOC Commissioner Tony Parker, in their individual and official capacities, based on their allegedly violating the plaintiff's rights to substantive and procedural due process and equal protection and conspiring with each other to violate the plaintiff's rights. (Doc. No. 1, at 1–2.) More specifically, the Complaint asserts (1) procedural due process claims against Law for recommending administrative segregation for the plaintiff; against Fisher, based on her keeping the plaintiff in administrative segregation "indefinitely"; against Fisher, Barlow, and Tidwell for conspiring to maintain the plaintiff in administrative segregation indefinitely;[14] and against Commissioner Parker for denying the plaintiff's appeal; (2) substantive due process claims against Fisher for placing the plaintiff in administrative segregation based on a knowingly false charge; against Tidwell for hiding evidence, strong-arming Kelso into staying

---

[14] At the time the plaintiff filed the Complaint, she was still in administrative segregation.

silent, and knowingly presenting false evidence against the plaintiff; and against Fisher, Tidwell, and Barlow for conspiring to keep the plaintiff in administrative segregation based on false charges; and (3) an equal protection claim against Fisher for punishing the plaintiff more severely than similarly situated White inmates. (*See* Doc. No. 1, at 5–11.) The plaintiff also complains generally about numerous TDOC policy violations. She requests monetary damages and the expungement of the "disciplinary infractions referenced in [the] complaint." (*Id.* at 13, 20.)

The court conducted an initial review of the Complaint under the Prison Litigation Reform Act and found that the Complaint stated colorable, non-frivolous claims against Fisher, Barlow, Tidwell, and Law for violating the plaintiff's right to substantive due process and/or conspiring to violate such rights and for violating her right to equal protection. The court concluded that these claims, as well as the plaintiff's claims for damages and injunctive relief against these defendants, should be permitted to proceed. (Doc. No. 5.) The court expressly dismissed any claim based on the defendants' alleged violations of TDOC policy and procedure, including by neglecting to provide her copies of disciplinary reports, not allowing her to choose an inmate advisor, and failing to announce a finding at the conclusion of her disciplinary hearing. (*Id.* at 5.) The court dismissed the procedural due process claims based on the defendants' placing and keeping the plaintiff in administrative segregation indefinitely and based on her increased security classification. (*Id.* at 6.) In addition, the court dismissed all claims against Commissioner Parker and referred the matter to the Magistrate Judge to conduct all pretrial proceedings. (Doc. No. 6.) In November 2021, counsel entered an appearance for the plaintiff, and the court vacated the referral to the Magistrate Judge. (Doc. Nos. 33, 36.)

Following completion of discovery, the remaining defendants filed their Motion for Summary Judgment, supporting Memorandum of Law, Statement of Undisputed Facts, and, as

referenced, substantial evidentiary material. (Doc. Nos. 53–55 and attachments.) The plaintiff filed her Response and supporting Memorandum, more evidentiary material, and a Response to the defendants' Statement of Undisputed Facts, as well as her own Statement of Additional Material Facts. (Doc. Nos. 56–61, and attachments.) The defendants filed a Reply and a Response to the plaintiff's Statement of Additional Material Facts, and two more exhibits. (Doc. Nos. 64, 65, and attachments.)

## III.     STANDARD OF REVIEW—RULE 56

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations— that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The

non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## IV.    DISCUSSION

As set forth above, the only remaining claims in this case are premised upon (1) alleged violations of the plaintiff's right to substantive due process by Fisher and Tidwell, (2) an alleged conspiracy among all the defendants to violate the plaintiff's right to substantive due process, and (3) defendant Fisher's alleged violation of the plaintiff's right to equal protection. The defendants seek summary judgment on each of these claims.

### A.    Substantive Due Process Claims

The plaintiff's substantive due process claims are premised upon allegations that (1) Tidwell knowingly pressured Kelso into staying silent about what really happened between her and Hardy and that Tidwell knowingly presented false testimony in the course of his investigation and at the Disciplinary Hearing; (2) Fisher sentenced the plaintiff to administrative segregation, despite knowing that the charge and conviction were based on false evidence; and (3) the other two defendants conspired with Fisher to keep Hardy in administrative segregation on false charges. (*See* Doc. No. 1, Counts II, V, VI,[15] VII, VIII.[16])

---

[15] The Complaint contains two Counts against Tidwell labeled "Count VI." Only the second survives.

[16] Count VIII, the only Count in the Complaint against Law, was arguably dismissed on initial review, as it appears to be a procedural due process claim premised upon alleged violations of TDOC policy. The court nonetheless broadly construes the Complaint as also asserting a claim against Law for conspiring with the other defendants to violate the plaintiff's right to substantive due process.

1.    *The Parties' Arguments*

The defendants argue that these claims are subject to dismissal, because the plaintiff "has not identified any evidence beyond her own allegations to show that false evidence existed or was knowingly relied upon by Defendants to justify her punishment for assaulting another inmate." (Doc. No. 54, at 5.) They argue that the only evidence supporting the plaintiff's claims is the letter allegedly written to her by Kelso (Doc. No. 1-3). Regarding that letter, they argue that the plaintiff has no corroborating proof that Kelso actually wrote the letter, but, even if she did, there is no evidence that Tidwell received or knew about the letter before this lawsuit was filed, and he has testified that Kelso never told him that she had lied to him in her first report about what had happened. Instead, she later gave him a letter from Hardy that further substantiated her initial account of the incident. The defendants further argue that, even if Tidwell knew about Kelso's alleged letter to Hardy, the plaintiff cannot show that he "ever had reason to doubt the veracity of Kelso's initial statement to him." (Doc. No. 54, at 6.) In support of this tack, the defendants point to undisputed evidence in the defendants' possession that supported Tidwell's conclusion that Hardy was the aggressor in the altercation and had assaulted Kelso, including Kelso's distraught emotional state in the immediate aftermath of the incident, the nature of her injuries (or reported injuries), and the accounts of two other inmates who witnessed the incident. Regarding the conspiracy claim, the defendants argue that the plaintiff has "no proof beyond her bare assertion of a conspiracy" among the defendants to send her to administrative segregation based on false evidence. (Doc. No. 54, at 7.)

In her Response Memorandum, the plaintiff points out that the defendants have not addressed Kelso's Affidavit or other circumstantial evidence in the record, including the fact that the hospital to which she was sent determined that Kelso was not seriously injured and that the photographs of Kelso submitted by the defendants reflect nothing more than a few scratches and

bruises that are consistent with the plaintiff's claim that she was defending herself against Kelso's attack. (Doc. No. 57, at 4–5.)

As for the evidence of a conspiracy, the plaintiff contends that Kelso's Affidavit and evidence gleaned from the defendants' own discovery materials would permit a reasonable jury to conclude that a "single plan existed amongst all four Defendants," that they "worked alongside one another to deprive the Plaintiff of her constitutional rights," and that "each Defendant committed an overt act in furtherance of the overall conspiracy." (*Id.* at 5.) As examples of this evidence, she asserts that "Defendant Law appears to have been involved in tampering with the already dubious disciplinary hearing summary document with a separate ink font and keeping the Plaintiff from immediately knowing how the disciplinary board ruled" and that these actions give rise to an inference that Law "sought to falsely effectuate the Plaintiff's placement in administrative segregation." (*Id.* at 6.) Regarding Barlow, the plaintiff also argues that there is evidence that he instructed Tidwell and Law to make sure that the plaintiff was found guilty of assault and placed in administrative segregation. As for Fisher's involvement, the plaintiff claims that the evidence shows that Fisher kept the plaintiff in administrative segregation, despite (1) the absence of serious injury to Kelso, (2) Fisher's receipt of a letter from Kelso confessing that she lied about the altercation, (3) Fisher's knowledge that the disciplinary hearing report summary reflected that the plaintiff had been found not guilty and appeared to have been tampered with, and (4) Fisher's awareness of the numerous TDOC policy violations asserted in the plaintiff's grievances. The plaintiff argues that these facts permissibly support an inference that Fisher "sought to falsely effectuate the Plaintiff's placement in administrative [segregation]." (*Id.*)

In their Reply, the defendants argue that, even if there is a factual dispute as to whether Kelso recanted the initial report that she gave Tidwell, the plaintiff cannot establish that any

defendant "*knowingly* relied on false evidence." (Doc. No. 64, at 1.) They argue, in other words, that, although Kelso's changed story might have given the defendants a reason to reevaluate Kelso's initial report, nothing about her recantation would have required the defendants to accept the truthfulness of her second version over the first, particularly given the corroborating evidence of the plaintiff's guilt—including, again, the injuries to Kelso and the fact that medical sent her to an outside hospital for assessment and treatment, her emotional demeanor when Tidwell first encountered her, the size difference between Kelso and Hardy, the witnesses' accounts, and the plaintiff's subsequent apology letter. They argue that this evidence collectively establishes the reasonableness of the conclusion that the plaintiff assaulted Kelso—regardless of whether she is actually guilty—and that the defendants did not knowingly rely on false evidence.

2.      *The Merits of the Substantive Due Process Claim Against Tidwell*

It is well established—and the defendants do not dispute—that offering false evidence or perjured testimony in a disciplinary hearing against a prisoner can sustain a substantive due process claim. *See Thomas v. Russell*, 202 F.3d 270 (Table), 2000 WL 32040, at *1 (6th Cir. Jan. 6, 2000) (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)); *Cannon v. Bernstei*n, No. 09-14058, 2015 WL 13741225, at *2 (E.D. Mich. May 26, 2015) (citations omitted), *report and recommendation adopted*, No. 09-14058, 2015 WL 5719665 (E.D. Mich. Sept. 30, 2015). The claim against Tidwell is premised upon his allegedly making false statements in support of the Disciplinary Report and knowingly giving false testimony at the plaintiff's disciplinary hearing.

The plaintiff is correct that the defendants have failed to specifically address Faith Kelso's Affidavit in which she alleges that, when Tidwell questioned her after the incident, he did not seem to be interested in what actually happened. Instead, he was allegedly focused on whether Hardy was involved in a drug-distribution ring. Kelso also claims that Tidwell rebuffed her attempts to

explain what actually happened, "refused to listen" to her, and told her to "shut up." (Kelso Aff. ¶¶ 8–9.)

Kelso's Affidavit does not actually address whether this interview was a follow-up to the first. In other words, she does not expressly indicate whether she initially told Tidwell that Hardy had assaulted and "strangled" her and was trying to clear things up during this second interview, or whether, instead, this was her first interview with Tidwell and he simply jumped to his own conclusions. However, in the letter attached to the plaintiff's Complaint, allegedly written by Kelso and relied upon by the plaintiff, Kelso apologizes that she "lied at first about hitting" Hardy and that she remembered punching Hardy in the nose. (Doc. No. 1-3, at 2–3.) As set forth above, the letter continues:

> I was just so mad @ you about the whole situation & by the time I snapped back to reality and realized that they was going to "AS" you it was to late. Nobody was trying to hear me and they wasn't trying to take me serious. When I was still in Unit 3 in D-pod I told Tidwell that I would have been better off if I had told the truth and took my seg days & he told me to shhh & not tell anyone else that.

(*Id.* at 3–4.)

The plaintiff apparently intends to rely on the truth of the matters asserted in the letter.[17] Accordingly, synthesizing Kelso's two writings, the court accepts as true, for purposes of the defendants' motion, that Kelso initially told Tidwell, while she was crying[18] and emotionally

---

[17] Kelso's letter is clearly hearsay, as it is an out-of-court statement by Kelso offered by the plaintiff for the truth of the matter asserted therein. Fed. R. Evid. 801. The parties have not addressed whether it may be admissible under some exception to the hearsay rule. For purposes of the Motion for Summary Judgment, the court presumes that the plaintiff would be able to present the statements contained in the letter at trial through Kelso's in-court testimony, even if the letter *per se* remains inadmissible. In addition, Kelso would be able to authenticate the letter and indicate when she sent it.

[18] The photographs that Tidwell took of Kelso immediately following the incident, submitted by the defendants, clearly show that she had been crying and still appeared to be upset. (*See* Doc. Nos. 55-13 through 55-16.)

distraught, that Hardy had assaulted her and "strangled her," causing the visible redness around her throat. (Tidwell Dep. 16–18.) The court also accepts as true that, when Kelso was interviewed by Tidwell again the next day, she attempted to retract her previous statement, but he essentially refused to listen to her, though he presumably knew that she was now contending that Hardy had not actually assaulted her.

The court also accepts as true the plaintiff's assertions that Kelso was not actually seriously injured, that Vanderbilt did not find her to have been seriously injured, and that the photographs do not reflect serious injury. At the same time, Tidwell testified that Kelso was "sent to medical" at the prison based on her report that Hardy had "strangled" her: "I could only determine that it was apparent that she had been in some sort of physical altercation and that she needed to go to medical for her complaints." (Tidwell Dep. 19.) Tidwell also testified that it was not his "determination [that] she had serious injuries." (Tidwell Dep. 32.) Rather, he made the determination to send her to medical, and the medical unit at the prison made the decision to "send her out"—that is, to send her to an outside hospital for assessment and treatment. (Tidwell Dep. 32.)

Viewing these facts in the light most favorable to the plaintiff and accepting as true her contention that she did not actually assault Kelso, that Kelso was not seriously injured, and that Kelso told—or attempted to tell—Tidwell that Hardy had not assaulted her, the court nonetheless finds that no reasonable jury could find that Tidwell knowingly presented false evidence to his supervisor that was incorporated into the Disciplinary Report or that he knowingly presented false testimony at the plaintiff's disciplinary hearing. Tidwell was presented by Kelso with differing versions of what actually happened, and Hardy expressly denied assaulting Kelso. But, as the defendants point out, he also had statements by two other inmates who witnessed the incident, both

of whom told him that Hardy had assaulted Kelso, and he was aware of the visible and obvious fact that Hardy was nearly a foot taller than Kelso and substantially outweighed her. (*See* Hardy Dep. 43; *see also* Doc. No. 55-25.) Further, even though it was later established that Kelso was not seriously injured, there was no dispute that she was sent to medical based on the perceived seriousness of her injuries and her report as to what had happened to her, and medical sent her to the hospital.

In other words, while Tidwell arguably possessed evidence from which he could have concluded that Hardy had not assaulted Kelso, he also possessed evidence to support the conclusion that she had. His apparent decision to credit the version of events relayed to him by Kelso immediately after the event and by the two witnesses whom he interviewed—over the plaintiff's story and Kelso's second version—cannot reasonably be characterized as knowingly disregarding the truth or knowingly presenting false evidence, either in the Disciplinary Report or in his testimony to the Disciplinary Board.[19] His decision regarding which version of events to credit certainly cannot be deemed the type of "conscience-shocking" conduct generally required to give rise to a substantive due process claim. *See Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (describing substantive due process as "protect[ing] a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked

---

[19] The defendants also assert that Kelso had motives to recant, including possible fear of reprisal and the existence of a romantic relationship between Kelso and Hardy. Certainly, because the relationship between Kelso and Hardy was a romantic one, the altercation can fairly be characterized as a domestic dispute. It is common knowledge that victims of domestic violence often have a change of heart and elect not to press charges after an assault by their domestic partner. While it is not clear that Tidwell actually knew that the relationship between the two was romantic and there is no evidence that Kelso was motivated by a fear of reprisal, as an investigator in the corrections system, he had undoubtedly been confronted with other victims who had experienced changes of heart motivated by such factors as bribes and threats of various kinds. Tidwell's decision to credit Kelso's initial account is understandable for this reason as well.

fundamental, and the interest in freedom from government actions that 'shock the conscience'" and "protect[ing] the right to be free from 'arbitrary and capricious' governmental actions, which is another formulation of the right to be free from conscience-shocking actions" (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 249–50 (6th Cir. 2003); other citations omitted)).

Tidwell, therefore, is entitled to summary judgment on the substantive due process claim asserted against him.

### 3. The Substantive Due Process Claim Against Fisher

The plaintiff's claim against Fisher is likewise premised upon allegations that Fisher kept her in administrative segregation despite actual knowledge that "the charge against Plaintiff was false," that she had been found not guilty at the disciplinary hearing, and that Kelso had recanted her accusations against the plaintiff but had been pressured by Tidwell to remain silent. (Doc. No. 1 ¶ 51.)

As set forth above, the plaintiff cannot establish that Tidwell knowingly presented false evidence. Even if she could, however, Hardy lacks evidence from which a reasonable jury could conclude that Fisher or any other defendant knew that Tidwell presented false evidence. The plaintiff herself received the letter from Faith Kelso at some point, but she has not presented evidence regarding when she received it or showing that anyone else knew about the letter prior to her discussing it during the Inmate Grievance Meeting on December 20, 2019. Likewise, even if it is true that Tidwell pressured Kelso to remain silent about what really happened, there is no evidence suggesting that Fisher knew that he had done so. Although Kelso claims to have sent Fisher a letter directly, there is no evidence as to when she sent it or as to whether Fisher received it. Moreover, as with Tidwell, even if Fisher had received a letter from Kelso at some point while the plaintiff was still in administrative segregation, there is no reason why Fisher would have been compelled to give it any credence.

Regarding the plaintiff's assertion that Fisher "knew" that the plaintiff had been found not guilty at the disciplinary hearing, no evidence supports that claim. As discussed above, although the Disciplinary Report Hearing Summary indeed was marked "N" for "Not Guilty" on the first page, the other portions of the Summary establish that the plaintiff, in fact, was found guilty, including the notations indicating a Class A infraction and that the plaintiff had appealed the decision. In addition, the narrative on page 2 of the Summary states that the plaintiff was found guilty and sets forth the recommended sentence, just above the signatures of the Disciplinary Board chairperson and members. (Doc. No. 55-10, at 5.) Even if the "N" for "Not Guilty" gave rise to some ambiguity, such ambiguity would not have been sufficient to put Fisher on notice that the Disciplinary Board had found the plaintiff not guilty of the charged offense, even if it had in fact done so.

Finally, the plaintiff suggests that Fisher should have known that there was something nefarious going on with the Disciplinary Report Hearing Summary and defendant Law, as the Board's acting chairperson, based on the numerous alleged TDOC policy violations and the fact that the Summary reflects two different colors of ink. However, as set forth above, the court has already dismissed the plaintiff's § 1983 claims based on TDOC policy violations, as inmates cannot state a § 1983 claim based solely on the failure to follow prison policies. (Doc. No. 5, at 5–6 (citing *Grinter v. Knight*, 532 F.3d 567, 574 (6th Cir. 2008)).) Moreover, the use of two different pens in completing the Summary plausibly suggests only that the first pen was running out of ink or was otherwise difficult to write with.

In sum, the evidence is not sufficient to permit a reasonable jury to find in favor of the plaintiff on her substantive due process claim against Fisher. The defendants' motion for summary judgment as to this claim will be granted.

4.      *The Conspiracy Claim*

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)). To establish a civil conspiracy in violation of § 1983, the plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff. *Hensley*, 693 F.3d at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).

In addition, as a threshold matter, the plaintiff must first establish that she suffered a constitutional violation in order to prove a conspiracy to violate her constitutional rights. *See Scott v. Stone*, 254 F. App'x 469 (6th Cir. 2007) (citing *Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1, 14 (1st Cir. 2003) ("To demonstrate conspiracy under § 1983, plaintiff must show an actual abridgement of some federally-secured right." (internal quotation marks omitted)); *Vaden v. Vill. of Maywood*, 809 F.2d 361, 366 (7th Cir. 1987) ("To state a claim for relief under 42 U.S.C. § 1983, [the plaintiff] must allege not only that the defendants conspired under color of state law to deprive her of her constitutional rights, but also that she was in fact deprived of those rights.")). Because the plaintiff has failed to show that she suffered a deprivation of her constitutional right to substantive due process, she axiomatically cannot show that Law and Barlow conspired with the other defendants to violate that right, even if they allegedly recommended or pushed for administrative segregation for the plaintiff. Moreover, even if the plaintiff could show that Tidwell had presented knowingly false testimony, there is no evidence to support a conclusion that either Law or Barlow knew that it was false.

**B.    Equal Protection Claim against Fisher**

The plaintiff asserts that she is African American and, as such, a member of a protected class, and that, based on her race, she was punished by Fisher more severely than similarly situated White inmates who had been charged with and found guilty of assault on another inmate without a weapon, without justification. (Doc. No. 1 ¶¶ 60–64.) The Complaint makes it clear that the equal protection claim is asserted against Fisher only. (*Id.* at 7 ("Count III. Defendant Fisher Violated Plaintiff's Fourteenth Amendment Right to Equal Protection by Indefini[t]ely Placing Her in Administrative Segregation.").) The conspiracy counts asserted against the other defendants reference due process, but not equal protection.

### 1.    Legal Standard

The Equal Protection Clause provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, which is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To invoke the court's strict scrutiny of a government action based on an alleged violation of the right to equal protection, the plaintiff must show that she was "denied equal protection of the law based upon an unjustifiable standard such as race, religion, or other arbitrary classification" or was "intentionally discriminated against because of [her] membership in a particular class, not merely that [she] was treated unfairly as an individual." *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999); *see also Brand v. Motley*, 526 F.3d 921, 924 (6th Cir. 2008) ("[A]n inmate, like anyone else, retains the right to be free from government-sponsored race discrimination unsupported by a compelling interest.").

The Supreme Court has held that "selective prosecution claims" are judged "according to ordinary equal protection standards." *Wayte v. United States*, 470 U.S. 598, 608 (1985). The Sixth Circuit applies the same standards to "selective enforcement" claims against police officers, for

instance, holding that such equal protection claims require proof that the challenged action "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005) (quoting *Wayte*, 470 U.S. at 608). "To show discriminatory effect, a plaintiff can proffer evidence showing similarly situated individuals of another race were treated differently through statistical evidence or identifying a person of another race who [was] treated differently." *Id.*; *see also Bey v. Falk*, 946 F.3d 304, 319 (6th Cir. 2019) (where the plaintiff alleged that police officers surveilled and stopped him because of his race, noting that the plaintiff, in the absence of direct evidence of discriminatory intent, could rely on indirect evidence, including "valid relevant statistical evidence of disparate impact or other circumstantial evidence"). However, "mere disparate impact is not sufficient to state an equal protection claim under § 1983." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000). There must also be proof of a discriminatory intent. *Id.*

In the absence of statistical proof of the type that would support an equal protection claim premised upon disparate impact on racial minorities broadly, the threshold element of an equal protection claim is disparate treatment of the individual as compared to similarly situated individuals outside her protected class. *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). An "equal protection" plaintiff asserting this type of claim must be similarly situated to her comparators "in all relevant respects." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011); *see also Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) ("'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'"); *Tree of Life Christian Schools v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018) ("A plaintiff bringing an equal protection claim must be 'similarly situated' to a comparator in 'all relevant respects.'").

Fisher argues that the plaintiff cannot establish her equal protection claim, because (1) a year in administrative segregation or maximum custody was "typical for an assault resulting in serious injuries," and Hardy's delay in completing the step-down program was due to an "unrelated investigation"; (2) although the plaintiff has identified a handful of White inmates who she claims were subjected to a less severe punishment, she cannot show that she was truly similar to those inmates in all relevant aspects, including with respect to the nature of the offense, the offender's disciplinary history, the type and severity of the injuries resulting from the assault, whether the offender was the subject of another investigation, and the offender's demonstrated cooperation or remorse; and (3) the plaintiff has no evidence that disparate treatment, if it occurred, was based on race. (Doc. No. 5, at 8–9.)

In response, the plaintiff points to her own sworn assertions that defendant Law, at some point, referred to her as a "fucking nigger" and that all the other inmates with her in administrative segregation were Black. (Doc. No. 57, at 6.) She also points to evidence that, she claims, shows that Fisher "denied administrative segregation for five different white inmates [who] were charged with the same offense as the Plaintiff." (*Id.*) The plaintiff also argues that the evidence establishes that Tidwell, Barlow, and Law influenced Fisher's decision to place Hardy in administrative segregation. (*Id.* at 6–7.)

In their Reply, the defendants argue that the undisputed evidence establishes that Fisher alone had the authority to place the plaintiff in administrative segregation and was solely responsible for that action. They contend that, as a result, an alleged racial slur by Law "[a]t some point between 2018 and 2019" (Hardy Dep. 37) is irrelevant and, moreover, that this single alleged use of a racial slur that was remote in time and uncoupled with any other evidence of disparate treatment does not constitute direct evidence of race discrimination. The defendants also repeat their contention

that the plaintiff's evidence does not establish that she was similarly situated with her proposed comparators.

### 3.    The Merits of the Claim

First, as set forth above, the Complaint very clearly states an equal protection claim against Fisher alone and does not assert that the other defendants conspired with Fisher to deprive the plaintiff of her right to equal protection. Moreover, regardless of whether Fisher took into consideration Tidwell's investigatory findings and testimony and the recommendation of Law and the Disciplinary Board in punishing the plaintiff by placing her in administrative segregation, the evidence is undisputed that Fisher alone possessed—and exercised—the authority to place and maintain the plaintiff in administrative segregation and to change her security classification to maximum. (Fisher Decl. ¶¶ 13–14; Fisher Dep. 83.) Consequently, the single, unrelated, and temporally remote use of a racial slur by David Law does not constitute direct evidence of discrimination on the basis of race. *See Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 459 (6th Cir. 2011) ("[T]o qualify as direct evidence of discriminatory intent, [a racial slur] must have been made by a person with decision-making authority." (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000); *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998); *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161–62 (6th Cir. 1990)).

Second, the fact that nearly all of the inmates in segregation at the same time as the plaintiff were Black does not constitute valid statistical evidence of the type that might qualify as circumstantial evidence of disparate impact, in the absence of evidence regarding the overall racial makeup of the inmate population at TPW at that time. The plaintiff has not actually introduced any statistical evidence relevant to her claim. Accordingly, her evidence regarding the number of Black inmates in administrative segregation at the same time she was does not constitute evidence of disparate impact based on race.

Regarding disparate treatment, however, the court finds that the plaintiff has succeeded in demonstrating the existence of a material factual dispute as to whether she received substantially harsher punishment for similar conduct than similarly situated White inmates. The defendants argue that the plaintiff has not shown that she was treated significantly differently because her comparators, like her, received "recommended punishment from the Disciplinary Board" of "between 10 and 30 days on administrative segregation." (Doc. No. 64, at 5.) As set forth above, however, it is not clear that Warden Fisher approved those sentences or that these inmates actually served any time in administrative segregation, much less eleven months.

As for the defendants' assertions that the plaintiff has not shown that these inmates were similarly situated in all relevant respects, because they pleaded guilty to the charges, had different disciplinary histories, and were not shown to have caused similarly serious injuries, the evidence indicates that all of these inmates had much more extensive disciplinary records than the plaintiff did; the defendants have not explained why pleading guilty should have made a substantial difference in sentence length, and one of the comparators, like the plaintiff, did plead not guilty. In addition, one of them was charged with using a weapon and causing injuries, and two of them had two Class A assaults in 2019. And, finally, while there is no real dispute that Kelso claimed to have been "strangled" and was sent out for assessment at Vanderbilt, there is at least a question of fact as to whether she actually suffered any serious injury and whether Fisher knew—particularly by the time she extended the plaintiff's disciplinary sentence beyond that recommended by the Disciplinary Board—that Kelso did actually suffer any serious injury.

The court finds, in sum, that Hardy has presented sufficient evidence to state a *prima facie* case of discrimination based on race, for purposes of her equal protection claim, based on her having received a substantially more severe punishment than similarly situated White inmates

charged with a similar infraction around the same time. The defendants have not adequately explained the disparate treatment. The court, therefore, finds that Fisher is not entitled to summary judgment on this claim.

## V.    CONCLUSION

For the reasons set forth herein, the defendants' Motion for Summary Judgment will be granted in part and denied in part.

An appropriate Order is filed herewith.


_____
ALETA A. TRAUGER
United States District Judge